UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JAMES FOX,

               Petitioner,                   Case No. 1:12-cv-582

v.                                             Honorable Robert J. Jonker

JOHN PRELESNIK,

               Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Ingham County Circuit Court, Petitioner was convicted of unlawful imprisonment, MICH. COMP. LAWS § 750.349b, and torture, MICH. COMP. LAWS § 750.85. On June 24, 2009, he was sentenced as a fourth felony offender, MICH. COMP. LAWS § 769.12, to respective prison terms of 10 to 50 years and 20 to 70 years. In his amended *pro se* petition, Petitioner raised four grounds for relief:

    I.      Violation of [Petitioner's] 14th Amendment Due [P]rocess Rights[.]

           *State['s] prosecutor failed to present sufficient evidence of all elements necessary to prove crimes charged[.]

           *Prosecutor repeatedly accused [sic] [Petitioner] of crimes not contained in the indictment information[.]

    II.     Violation of [Petitioner's] 5th Amendment Right against [S]elf Incrimination; [Petitioner's] [R]ight to [C]ounsel[.]

On January 15th, 2008, [Petitioner] was subjected to custodial interrogation which was audio-visually recorded and used against Defendant at criminal trial[.]

*[Petitioner] asked to leave repeatedly, and was told he must speak to detectives[.]

III.    State Denied [Petitioner's] Due Process Right to Confront his Accus[er] – Prosecutorial Miconduct[.]

*Trial Court Admitted the testimonial statements of Marquis Hightower via a third party, specifically Detective Kim Kranich[.]

*Marquis Hightower was never made available for cross examination[.]

*Marquis Hightowers statements gave police detectives probable cause to arrest [Petitioner.]

*Prosecutor failed to correct the false testimony of states witnesses[.]

IV.    Ineffective Assistance of Counsel[.]

*[Petitioner's] trial lawyer failed to properly investigate the use of an expert in DNA analysis[.]

*Trial counsel failed to object to the admission of "bad acts" testimony as well as the admission of evidence in violation of defendants 5th Amendment right against self incrimination.

(Am. Pet., docket #8, Page ID##56-60.)  Respondent then moved to dismiss the petition for failure to exhaust certain grounds, and Petitioner moved to dismiss his unexhausted claims and proceed on his unexhausted claims.  On February 24, 2014, the undersigned issued a report and recommendation to dismiss

all claims raised in the amended petition . . . except for the following claims:  the insufficient evidence claim set forth in Issue I; the prosecutorial misconduct claim arising from other bad acts evidence (i.e., the prosecutor presented evidence "of crimes not contained in the indictment information") as set forth in Issue I; and the

ineffective assistance of counsel claim arising from trial counsel's failure to object to the admission of petitioner's audiovisual statement at trial as set forth in Issue IV.

(R&R, docket # 32, Page ID#114.)  In an order issued on March 20, 2014 (docket #33), the district judge approved and adopted the report and recommendation.

Respondent has filed an answer to the remaining claims in the petition (docket #35), stating that the grounds should be denied because they are procedurally defaulted or lack merit. Upon review and applying the AEDPA standards, I conclude that Petitioner's claims are either noncognizable or without merit.  Accordingly, I recommend that the petition be denied.

## **Procedural History**

### A.    **Trial Court Proceedings**

The state prosecution arose from the torture of Petitioner's pregnant girlfriend over the course of several hours on January 15, 2008.  Petitioner was charged with one count each of torture and unlawful imprisonment.  A supplemental information was filed charging Petitioner as a habitual offender, fourth offense.  Petitioner was tried before a jury beginning May 12, 2009, and concluding on May 20, 2009.[1]

Lansing Police Officer Michael Lam testified that, on January 15, 2008, he was working on patrol in the evening hours.  He was dispatched to 1506 Glenrose Street in Lansing, Michigan, on a report of kidnapping that Lam subsequently learned was made by Petitioner.  (Tr. I at 193-94.)  Based on information from the caller, Officers Rendon, Hallet, and Porter conducted a

---

[1]Transcripts of the trial proceedings hereafter will be designated as follows:
May 12, 2009 (docket #20): "Tr. I at ___."
May 14, 2009 (docket #21): "Tr. II at ___."
May 18, 2009 (docket #22): "Tr. III at ___."
May 19, 2009 (docket #23): "Tr. IV at ___."
May 20, 2009 (docket #24): "Tr. V at ___."

high-speed stop on a brown Chevrolet Caprice a few blocks from the alleged kidnapping.   (*Id.* at 194-95, 202-03.)  Officer Lam joined the officers at the scene of the stop, and they approached with their guns in the low ready position.  (*Id.* at 196, 203.)  Lam removed Petitioner from the front seat of the vehicle and handcuffed him.  (*Id.* at 196.)  Lam took a statement from Petitioner.  Petitioner indicated that he was not injured, and he appeared calm and cooperative.  As they walked toward Lam's vehicle, Petitioner whispered that he was being held hostage by the black man in the car (Marquis).  (*Id.* at 199.)  Lam placed Petitioner in the back seat of his patrol car, at which point Petitioner became hysterical:  his hands began to shake, his voice sped up, and he spoke in a louder tone of voice.  (*Id.* at 198.)  Petitioner told Lam that his girlfriend was being held hostage at the house on Glenrose by another man identified as "Mouse."  (*Id.* at 199.)  Petitioner stated that he knew Mouse as someone from whom he had purchased marijuana on other occasions.  (*Id.*)  According to Petitioner, he met Mouse and Marquis as he was walking to the store from 1506 Glenrose.  Petitioner asked Mouse if he had marijuana, and Mouse said he did.  Petitioner invited the two men back to 1506 Glenrose to smoke marijuana and watch television.  (*Id.* at 199-200.) After they had been watching television for awhile, Mouse and Marquis drew guns on Petitioner and his girlfriend.  One of the men ordered Petitioner to duct tape his girlfriend's hands, feet and face. They then ordered him to carry her upstairs.  Marquis left the house and came back driving the brown vehicle the police eventually stopped.  Marquis ordered Petitioner into the vehicle to go to the Sunoco gas station a couple of blocks away.  (*Id.* at 200.)  Petitioner called the police from the gas station.  (*Id.* at 201.)  Petitioner told Officer Lam that both men had semi-automatic guns, one of which had a wood stock.  (*Id.*)  Lam subsequently identified Mouse as Octavio Santiago and Marquis as Marquis Hightower.  (*Id.* at 208.)

Lansing Police Officer Dylan Zehr testified that he was working as a uniformed patrol officer on January 15, 2008.  He received a dispatched call at about 7:30 p.m. from Petitioner, who identified himself as "Jami Fox" or "Jim Fox."  (*Id.* at 215.)  The caller said that he and his girlfriend were being held hostage at 1506 Glenrose, that there were guns, that the caller had gotten away from the house and was able to call on a cell phone, and that he and another man were in a brown Caprice older-style vehicle at a party store near that address.  (*Id.* at 215-16, 220.)  Zehr responded to the call within five minutes, taking a surveillance position a little north of the address, so that he could watch it and give information to other officers.  (*Id.* at 216-17, 219.)  Sergeant Joe Dionese, Officer Mike Lam, Officer Don Porter and other officers all eventually responded, but Zehr arrived first.  (*Id.* at 218.)  Later, the Lansing Fire Department responded, because of their greater first-aid capacity.  (*Id.*)  Zehr saw the brown Caprice heading toward the house, but it then drove east, then north, circling the block.  Zehr called out the vehicle description and license plate, and officers eventually made a traffic stop on the vehicle.  (*Id.* at 220.)  Zehr remained in his position until after the vehicle had been stopped.  (*Id.*)  After the stop, Zehr received word that two subjects were still in the house, one of whom was a woman, who was hurt badly.  (*Id.* at 222.)  He met up with Officer Rendon and Sergeant Dionese, and they approached the house on foot.  Dionese maintained a position a bit south of the house, while Zehr and Rendon went to the front door.  Zehr pounded on the door with his flashlight, and he announced that he was the police.  (*Id.* at 223.)  He then heard a female voice yell from inside, "[H]elp me, help me."  (*Id.*)  Zehr kicked the door in and had his firearm in the low ready position as he entered.  He saw a stairway that ran up the north side of the house and heard a woman screaming.  He heard Dionese call out that a man had run out of the house, and he motioned for Dionese to come over, as he and Rendon went upstairs.  (*Id.* at 223-25.)  They found a woman,

whom Zehr later identified as Raya Doyle, in the northwest bedroom, taped to the chair, blindfolded, and facing away from the door.  (*Id.* at 224, 226.)  Her shirt was cut off of the front of her and draped down, leaving her naked from the waist up.  (*Id.* at 227.)  As soon as Rendon and Dionese cleared the rest of the house, Zehr untied Doyle's blindfold.  (*Id.* at 225.)  He could see that Doyle had bruises and lacerations to her upper chest and that she was frantic.  (*Id.* at 226.)  As soon as she was cut free, Doyle jumped up, ran to her dresser, stripped her clothes off, and got into dry clothes.  (*Id.*)  Zehr attempted to ask questions, but she wasn't responsive to his questions.  She was coherent, but not talking very logically, and she was moving around quickly.  (*Id.* at 226-27.)  The room had a space heater that was operating, a twisted broomstick handle, duct tape, and a toolbox.  (*Id.* at 227-28.)  Once he could see that Doyle was not going to be able to answer questions, he decided to let her go to the hospital and interview her later.  (*Id.* at 228.)  After refreshing his recollection with his testimony at the preliminary examination, Zehr testified that Doyle asked him to check the closet and kept asking him if they had "caught all of them yet."  (*Id.* at 232.)  She told him that her boyfriend, Jami Fox, was involved, along with his two friends.  (*Id.*)  Once Doyle was transported to the hospital, Zehr drafted a search warrant for the house and the vehicle.  The warrant was signed and ultimately executed by Officer Nardone and other officers.  (*Id.* at 233.)

Officer Jennifer McGuire testified that she was scheduled to come on duty at 8:30 p.m. on January 15, 2008, but she was called in early.  (*Id.* at 240-41.)  She was dispatched to 1506 Glenrose at approximately 8:00 p.m.  (*Id.* at 241.)  She was at the scene when Doyle was placed in the ambulance, and she followed the ambulance to Sparrow Hospital, St. Lawrence campus.  (*Id.*)  She was present when Doyle was unloaded from the ambulance, and she stayed with Doyle until she was relieved by the detectives.  (*Id.* at 241-42.)  Doyle began to talk with McGuire as soon as she

got out of the ambulance.  Doyle was distraught and physically exhausted.  (*Id.* at 242.)  McGuire could see that Doyle's face was very swollen, though the rest of her body was covered up.  (*Id.* at 242-43.)  McGuire asked Doyle to talk about the events from the beginning, and Doyle wanted to talk and wanted to figure out why this attack had happened.  McGuire spent hours with Doyle, compiling her statement throughout the time the hospital was treating Doyle and running tests.  (*Id.* at 243.)  Doyle was upset and confused and repeatedly began to cry.  She was coherent, but extremely distraught.  (*Id.* at 244.)  Doyle told McGuire that two unknown men that were with her boyfriend had beaten her up for no reason.  (*Id.*)  Doyle stated that her boyfriend gave her commands throughout the events, and that he was the one who spoke directly to her and explained the consequences.  (*Id.* at 245.)  As Doyle explained what happened to her, McGuire looked at her injuries and photographed them.  (*Id.* at 245.)  McGuire identified a photograph showing Doyle's bruised abdomen, where Doyle was beaten.  (*Id.* at 247.)  McGuire also identified a photograph of the bruised and abraded right side of Doyle's face and neck, where she had been beaten and hit.  McGuire also identified a photograph of the top of Doyle's swollen right hand and wrist, where tape marks were clearly visible.  (*Id.* at 248.)  Other photographs showed the bruised and swollen left side of Doyle's face, her swollen ankles showing binding marks, and her bruised left hand.  (*Id.* at 248-49.)  Doyle testified that her knees and shin had been beaten multiple times, and photographs showed bruises and swelling to both legs.  (*Id.* at 249-50.)  McGuire acknowledged on cross-examination that, because Doyle was blindfolded, she did not know which of the three men had actually beaten her.  (*Id.* at 250.)  McGuire testified that Doyle had told her that she lived with and was pregnant by Petitioner, and that they had been watching television until 4:30 p.m., until one of the men ordered Petitioner to duct tape her.  Doyle also told McGuire that one of the men said, "[W]e will murder

you, James." (*Id.* at 253.)  Doyle reported that Petitioner told her to lie face down, after which duct

tape was used to bind her arms behind her back, tape her legs together, and tape her mouth closed.

She was carried up the stairs face down, and Petitioner told her not to look at anyone.  (*Id.* at 262.)

Doyle told McGuire that she was put into a bedroom, and her face was covered with clothing.  She

was then beaten on her face and stomach.  (*Id.* at 262-63.)  Doyle told McGuire that she was

repeatedly asked about Lee Targgart, a man who helped Doyle with her rent, but she did not know

who asked her, "When will Lee be here?"  (*Id.* at 258, 263.)  She stated that Lee had contacted her

the previous Friday, telling her that unknown men had been threatening to tell his wife about the

money he gave her.  Lee then called on the Sunday before the assault to say that he had told his wife.

Petitioner was present when the call came in, and he seemed upset, possibly because he was afraid

about the money ending.  (*Id.* at 263-64.)  Doyle told McGuire that she felt that the assault had

happened because Petitioner had gotten upset that the money would stop, and she thought he had

something to do with the assault.  (*Id.* at 265.)  Doyle reportedly could not recall who was saying

things to each other, including, "[G]et the pliers."  (*Id.* at 259-60.)

Raya Doyle testified that Petitioner was her boyfriend, even up to the time of trial.

(Tr. II at 280.)  Doyle stated that she met Lee Targgart about ten years earlier at Deja Vu, a strip club

where she worked.  (*Id.* at 281.)  About two years later and for about two more years, she began to

perform sexual dances for him.  Thereafter, she had a sexual relationship with Targgart.  (*Id.* at 282.)

She knew that Targgart was married and that his wife was unaware of their relationship.  (*Id.*)

Targgart paid all of Doyle's bills in cash for five or six years, and she had not worked for five or six

years before January 15, 2008.  (*Id.* at 282-84.)  Doyle never had Targgart's telephone number,

because he was married and did not want to be called.  Instead, Targgart called Doyle by using a

prepaid phone card at pay phones.  (*Id.* at 283.)  Targgart initially told Doyle that he lived in Detroit,

but she later learned that he lived in Ann Arbor.  (*Id.*)  Doyle testified that she had a problem with

crack cocaine and alcohol.  (*Id.* at 284-85.)  She saw Targgart once or twice a week.  He would call

her and say that he would be there in a half-hour or forty-five minutes, and she would wait.  (*Id.* at

285.)  They usually went out to lunch, and he would take her shopping or to a hotel room.  (*Id.*)

Doyle met Petitioner on May 4, 2007, when he was a trustee at the county jail and she was being

booked into the jail.  (*Id.*)  They communicated until early September by writing back and forth.

After Petitioner was released in September, Doyle quit sleeping with Targgart, telling him that she

was going to marry Petitioner.  Targgart congratulated her.  He had met Petitioner on a number of

occasions and had taken both Doyle and Petitioner out to lunch.  (*Id.* at 286-87.)  Targgart continued

to pay the bills.  According to Doyle, Targgart liked Petitioner and each man knew about Doyle's

relationship with the other.  (*Id.* at 287-88.)

       In the fall of 2007, someone broke into Targgart's Jeep while it was parked in Doyle's

driveway.  Targgart and Doyle were in Doyle's bedroom when they heard a big boom.  Targgart ran

downstairs to find the driver's side front window had been smashed out.  (*Id.* at 288-89.)  Petitioner

was not at home at the time.  Although Petitioner lived with Doyle, he would sometimes take off for

a week or two at a time.  (*Id.* at 289.)  Targgart's bag, which he called his purse, was taken from the

Jeep.  The purse contained his wallet, $5,000.00, the keys to his other cars, his cell phone, and other

personal items.  (*Id.* at 290-91.)  Sometime later, Doyle was in the yard, picking up walnuts from

under her back tree, and she looked over the fence into a neighbor's yard and saw Targgart's purse.

(*Id.* at 290-92.)  The wallet was gone, but the $5,000.00 was still there.  (*Id.* at 291, 377-78.)  She

took the money and spent some, keeping the rest in her shoe.  However, Petitioner pulled her shoe

off to get to the rest of the money, threw a couple of hundred dollars back at her, and took the remaining thousands and left for a week or two.  (*Id.* at 378.)

Near the end of December 2007, Doyle learned she was pregnant with Petitioner's child.  (*Id.* at 292.)  She told Targgart that she was pregnant in the first week of January, and he congratulated Doyle and shook Petitioner's hand.  Doyle believed that Targgart was going to stay around and help pay for the baby.  (*Id.* at 293.)  On January 13, 2008, Targgart called Doyle and told her that he was afraid for his family, that people had been calling and threatening him, and that he had decided to tell his wife about his relationship with Doyle.  Targgart told Doyle that he would not be helping her with money any more.  (*Id.* at 294.)  Doyle even spoke with Targgart's wife during the call.  (*Id.*)

Doyle told Petitioner the news, and she wondered what she was going to do, as neither she nor Petitioner had a job.  (*Id.*)  At that time, she had no money.  Both Doyle and Petitioner were freaking out, though Petitioner was calmer than she was.  (*Id.* at 295.)  Targgart told Doyle that he would call her Tuesday, January 15, because he wanted her to meet his wife.  (*Id.* at 295-96.)  On the afternoon of January 15, 2008, Doyle was watching television, listening to the radio, and playing the bass guitar, while sitting on the bed in the living room.  (*Id.* at 296, 299.)  She had just started drinking whiskey, though she had not used any drugs that day.  Petitioner told Doyle that he was going to the store.  (*Id.* at 296-97.)  He was not gone long.  When he came back, he was accompanied by two men she did not know.  (*Id.* at 298.)  It was unusual for Petitioner to bring people home, because he knew that Doyle did not like other people in the house.  (*Id.* at 351.)  One of the men was a tall, skinny Hispanic male with long curly hair.  The other was a tall, stocky black man.  After they arrived, they all sat in her living room and watched Doctor Phil on television.  (*Id.*

at 298-99.)  At 4:20 p.m., both men stood up and she heard clicks from both sides, as the two men

racked their guns.  (*Id.* at 302-03.)   She did not understand why the guns had been taken out, and

she laughed and asked if they were kidding.  (*Id.* at 304-05.)  The Hispanic man said, "Raya lay

down on the bed."  (*Id.* at 304.)  Someone said, "[G]et the duct tape out."  (*Id.* at 307.)  The black

man pulled duct tape out of his coat.  Petitioner then stated, "I think this is serious, you better lay

down."  (*Id.* at 305.)  He touched Doyle on the shoulder, guiding her down, saying, "I think you

better do it."  (*Id.* at 306-07.)  Petitioner began to duct tape Doyle, and Marquis finished the process.

(*Id.* at 307.)  Doyle was positioned face-down on the bed, with her head turned to the side, looking

toward the black man.  (*Id.* at 307-08.)  Petitioner duct-taped her hands behind her back, but the

black man was yelling at him to hurry up and make it tighter.  Her whole hands and wrists were

bound, cutting off circulation.  (*Id.* at 308-09.)  Marquis also taped Doyle's legs together at the

ankles.  (*Id.* at 309-10.)  One of the two men told Petitioner to pick Doyle up, and Petitioner threw

Doyle over his shoulder.  (*Id.* at 310.)  The men told Petitioner to take Doyle down to the basement,

but Petitioner objected, saying, "[N]o, don't take her down there . . . ."  (*Id.*)  One of the men said

that they would take Doyle upstairs.  (*Id.*)  Petitioner carried her upstairs and into the left bedroom.

(*Id.* at 311.)  Doyle stated that she was taken into the room where she threw her clothes.  She

explained that she was a drug addict and did not keep her house clean at the time.  (*Id.* at 311.)

Petitioner laid her down on the clothes.  (*Id.* at 311-12.)  Doyle testified that she did not remember

when her mouth was taped, but it was.  (*Id.* at 312.)  After she was laid down, everyone but the black

man, Marquis, left the room.  (*Id.* at 313.)  Marquis then began beating her, repeatedly asking for the

phone number for Lee (Targgart).  (*Id.* at 313.)  He insisted that Doyle get Lee there or they would

keep beating her until she did.  (*Id.* at 313.)  Doyle kept responding that she did not know Lee's

phone number and that she had never called him. She did not even know where his store was. (*Id.* at 314.) She was on her back, with her arms taped behind her, and Marquis kept beating her in the stomach and in the face. Doyle's circulation in her hands was being cut off, and she thought she would lose them. (*Id.*) She believed the beating went on for an hour or an hour-and-a-half, with occasional breaks for a few minutes while he left the room. (*Id.* at 315.) She heard whispering, but she could not make out who was talking or what was said. (*Id.* at 316.) In addition to beating her, Marquis burned her with a cigarette on her right hip. Marquis prepared to pull Doyle's pants down, threatening to burn her vaginal area. (*Id.* at 317.) Petitioner was in the room at the time, and he said, "[D]on't burn her." (*Id.*) Marquis told Petitioner to leave the room, and then he pulled Doyle's pants down and burned her hip with a cigarette, repeatedly. (*Id.*) She was left with round scars from the cigarette burns. (*Id.* at 317-18.)

Petitioner picked up Doyle and carried her to the other bedroom. A chair, radio and heater had been moved from the living room and placed in that bedroom. (*Id.* at 318-19.) Petitioner was told to cut the tape from her hands and retape her to the chair. (*Id.* at 319-20.) When Petitioner worked too slowly, the others yelled, saying that he should hurry, saying, "[I]f you don't do it and do it faster, I'm going to do it and I'm not going to do it nice . . . ." (*Id.* at 321.) She was blindfolded with fabric cut from a robe that was in her dresser. (*Id.* at 321-22.) She suddenly felt someone pulling on her shirt, and they cut through the layers of her clothes and her bra, leaving her chest exposed. One of the men, she believed it was Santiago, said, "[C]ut the bitch." (*Id.* at 322-23.) She then was sliced several times on both of her breasts. (*Id.* at 323, 327.) Petitioner said nothing. (*Id.* at 324.) Doyle also continued to be punched in the face, and she passed out. She awoke to freezing water being dumped on her head, which sounded like it was poured from a gallon jug. (*Id.* at 324.)

Because her mouth was taped, she felt like she was going to drown.  (*Id.* at 333.)  When they would ask her to speak, they removed the tape, putting it back on after.  (*Id.* at 325.)  Occasionally during the beatings, someone would give her a sip of whiskey.  At one point, the whiskey was poured on her wounds, burning her.  (*Id.* at 325-26.)  Someone started beating her hands, and she feared her hands would be broken, preventing her from playing the guitar.  (*Id.* at 326.)  At another point, someone used an object, possibly a broomstick, to hit her across her shins three times and across the top of her legs once.  (*Id.* at 328.)  Santiago put the barrel of a gun into her mouth and told her to suck it.  She was afraid he was going to pull the trigger.  (*Id.* at 330.)  The room became quiet. Shortly thereafter, she heard pounding on the door and then an announcement that it was the Lansing Police Department.  (*Id.* at 330.)  Doyle estimated that she spent an hour-and-a-half in the second bedroom.  (*Id.* at 331.)  She stated that the men would hit her for five or ten minutes before taking a break for a couple of minutes.  (*Id.* at 332.)  At one point, they hit her so hard that she urinated on herself.  (*Id.*)  She was afraid that her legs were broken, but after the police arrived, they removed the blindfold and the tape, and she was able walk out. (*Id.* at 333.)  Because she was wet and freezing, she went into the room with the clothes, stripped her clothes off and put on a change of clothes.  (*Id.* at 334.)  She was taken by ambulance to the hospital.  They took x-rays and an ultrasound, gave her crutches, and put steri-strips on her chest wounds, because she refused stitches. (*Id.* at 334-35.)  She also had CT scan, but she passed out.  (*Id.* at 339.)  According to Doyle, medical personnel believed that the baby she was carrying would be dead, but the baby lived.  (*Id.* at 336-37.) When she was released from the hospital, Doyle was taken to a domestic violence shelter.  (*Id.* at 337.)

Doyle testified that she talked to the female police officer who was with her at the hospital and who took pictures. Detectives Kranich and Gill came to see her the next day. (*Id.* at 338.) By that time, she felt the full effect of the beating, and she could hardly walk. She could not take pain relievers because she was pregnant. (*Id.*) A few days later, Detective Kranich took Doyle to have additional photographs taken at Edward's Studio. (*Id.* at 339.) Doyle identified photographs of the burns, cuts and bruises. (*Id.* at 339-40.) She testified that her legs and hands continued to hurt a great deal at the time of trial. (*Id.* at 340.) Because of being hit hard on the head during the assault, Doyle now has to take Keppra, an anti-convulsant, to keep from having seizures. (*Id.* at 341.) She also has been diagnosed with post-traumatic stress disorder, causing her nightmares and flashbacks daily. She was prescribed Abilify, Prozac, and Cymbalta for depression, and she takes Ambien to sleep. (*Id.* at 342-43.) She has continuing scars on her hips and breasts. (*Id.* at 343.)

On cross-examination, Doyle testified that Petitioner did not have a gun, while the other two men did. She claimed that he was calm in a crisis, and she was not surprised that he did not fight men with guns. She also testified that she heard Marquis yell at Petitioner in the hall, saying that "he would murder [Petitioner's] ass right now." (*Id.* at 361.) She testified that she did not remember what she told Officer McGuire about Petitioner's involvement, but she was "out of it at the time." (*Id.* at 373.) On redirect, Doyle testified that she still loved Petitioner and that she believed he still loved her, based on the two letters she received from him between January 2008 and May 12, 2009, the day of trial. (*Id.* at 376-77.) She also acknowledged that Petitioner had taken her money before and had taken off for a week or two at a time, without notice. (*Id.* at 377.)

Tom Dyer testified that he was a landlord and that he had owned the house at 1506 Glenrose for eight years. (*Id.* at 393-94.) Raya Doyle lived at that house for six or six-and-a-half

- 14 -

years until January 2008.  (*Id.* at 394.)  He had met Petitioner a couple of times at the house.  (*Id.*)

He received a call from Petitioner on January 15, 2008 at 6:00 p.m.  Petitioner told Dyer that there

was a medical issue with Raya and that he was trying to get ahold of Lee Targgart.  (*Id.* at 395.)

Dyer had met Targgart on a couple of occasions, and he knew that Targgart supplied the rent money.

(*Id.* at 396.)  Dyer was surprised by the call and surprised by Petitioner's calm tone, which was at

odds with his claim of emergency.  A couple of days after the assault on January 15, 2008, Dyer went

back to the house to start cleaning it and putting it back together.  While cleaning the basement, he

found a loaded automatic handgun on a shelf near the bottom of the basement stairs.  (*Id.* at 397.)

Dyer identified People's Exhibit 24 as the handgun he found.  Dyer made the gun safe by removing

the clip and unloading the chamber, and then he called the police. (*Id.* at 399.)

Lee Targgart testified that he owned two hardware stores.  He lived in Ann Arbor and

had been married for 40 years.  He met Raya Doyle when she was a dancer at Deja Vu eleven years

earlier.  (*Id.* at 404.)  He began a sexual relationship with her, and he paid all her bills for seven

years.  (*Id.* at 405.)  He had sex with Doyle for the last time in the summer of 2007, and their

relationship ended in the fall of 2007, when she told him that she planned on getting married.  (*Id.*

at 405-06.)  He testified that for the last six years of the relationship he felt threatened.  (*Id.* at 406.)

Targgart paid Doyle's bills from 2001 until January 2008, months after the sexual relationship had

ended.  (*Id.* at 407.)  Targgart was fearful of his wife finding out about the relationship.  (*Id.* at 407-

08.)  Targgart paid Doyle's rent each month by way of a cashier's check made out to Dyer.  (*Id.* at

408.)  He and Doyle would travel to the utility companies each month to pay the gas and electric.

They also would go to the grocery store together to get food.  (*Id.*)  Doyle did not have his phone

number.  During the work week, he would call her on her cell phone, for which he purchased

minutes, to see if she was home.  (*Id.* at 409.)  In the summer of 2007, Doyle was in jail.  Targgart

would come to her home once per week to take care of her cats.  He also would visit her in jail and

put money in her prisoner account.  (*Id.* at 409-10.)  During that time, she told him that she had met

Petitioner, that she was serious about him, and that they mailed one another in jail.  (*Id.* at 410.)

Doyle got out of jail first, and after Petitioner got out of jail, Targgart met him six or eight times.

(*Id.* at 410-11.)  Targgart was happy that Doyle had found someone to marry, as she needed

someone.  He told her that she needed to take care of her driver's responsibility fee, so that she could

get her license back, and he told her that he would buy her a used car, so that she could get around

and get a job.  (*Id.* at 411.)  Targgart intended to pay the driver's responsibility fee.  (*Id.* at 414.)

Between September 2007 and January 2008, he saw Doyle three to four times per month.  Targgart

owned a 2002 Jeep, a 2006 Jeep Commander, a 1993 Buick, and a 2002 Viper, all of which

Petitioner saw him drive.  (*Id.* at 412.)  Targgart was told that Petitioner's father had a construction

company and that Petitioner was working with his father and his brothers.  (*Id.* at 413.)

        In October 2007, shortly after noon, Targgart was at Doyle's home.  After they had

been upstairs for 10 or 15 minutes, he heard a crash.  (*Id.* at 413.)  When he looked out the window,

he did not see anything, so he went downstairs.  She saw that his driver's side front window was

smashed out.  (*Id.* at 413-14.)  His purse, which contained about $6,000.00, his wallet, credit cards,

and car keys.  (*Id.* at 414.)  He had planned to pay the rest of Doyle's driver's responsibility fee, the

rent and possibly some other bills.  Targgart's wallet also contained the business card of Mark

Leonard, an attorney who previously had met with Targgart and Doyle about her situation.  Targgart

did not report the theft to the police, because he did not want anyone to know about it.  (*Id.* at 415.)

He canceled his credit cards and made an appointment to have the window fixed the next day.  (*Id.*)

- 16 -

Two or three weeks later, when he came to see Doyle, she told him that someone had found the bag behind the house and everything was in the bag except the money and his wallet, which contained his identification and credit cards. (*Id.* at 416.)

On January 9, 2008, Targgart's daughter-in-law, Elizabeth, called him to tell him that someone calling himself Mark Leonard was trying to call him. (*Id.* at 416, 419.) Targgart called the number he was given, but he knew as soon as he heard the man answer that it was not Leonard. (*Id.* at 416-17.)   The man pretending to be Mark Leonard told Targgart that he knew about the relationship between Targgart and Doyle and that he would like $5,000.00 brought to Lansing that afternoon.   The man gave directions to drop the money at 1014 Shiawassee, and the man promised that the matter would be over if he received the money.   The man told Targgart that he should not tell Doyle. (*Id.* at 418.)   The person was polite, and Targgart thought that he would comply. (*Id.* at 418-19.)   Targgart's only clue about the caller was that the man sounded like an African American. (*Id.* at 419.)   Targgart told the man that he could not come up with $5,000.00 that afternoon, but that he would have to go to the bank in the morning to pick it up.   The man said that would be fine, and to call him back once Targgart had the money. (*Id.*)   Targgart picked up the money at the bank at about 10:00 a.m. the following day.   He called the man and told him that he would be in Lansing in an hour.   After having some difficulty finding the address, Targgart drove to the house and dropped the money over the fence, as instructed. (*Id.* at 420.)   Targgart then drove away and called a few minutes later.   The man confirmed getting the money and told him that he could come back to pick up his wallet, but Targgart declined to return. (*Id.* at 421.)   On January 1 or 12, 2008, Targgart learned that other members of Targgart's family, including his brother and sister-in-law in Kalamazoo, had received calls from someone trying to find Targgart. (*Id.* at 417, 422-23.)   He knew

that he had to put an end to it and tell his family what had happened.  (*Id.* at 423-24.)  On January

13, 2008, he told his wife, daughter, son and daughter-in-law about Doyle and about the extortion

that was happening.  (*Id.* at 425.)  He and his wife then called Doyle from a pay phone to tell her that

the extortion needed to end and that there was no more money coming.  (*Id.*)  Targgart also called

the man who had demanded $5,000.00 to tell him that he had told his wife and that Doyle also knew

about it.  (*Id.*)  Targgart told Doyle that he and his wife planned to go to Lansing on January 15,

2008, that they would get something to eat and that they wanted to talk with her.  Doyle agreed.  (*Id.*

at 426.)  However, he and his wife ultimately were not able to make it that day, and Targgart called

Doyle to tell her, but Doyle's phone was dead.  On January 17, Targgart and his wife drove up to

Lansing to Doyle's house.  They found Tom Dyer's car there, and Dyer told Targgart what had

happened to Doyle.  (*Id.* at 427.)  Targgart testified that the man he spoke with on the phone was not

Petitioner.  (*Id.* at 434.)

Lansing Police Officer Jeffrey Hudak testified that he worked on the scene at 1506

Glenrose as part of the crime scene investigation unit.  On January 16, 2008, he photographed and

removed evidence from a 1987 Chevrolet Caprice four door that had been brought in the night

before.  (*Id.* at 439.)  The glove box of the car contained a number of different identification

materials:  a Michigan driver's license for Lee Alan Targgart and a University of Michigan hospital

card in the same name; an identification for Steven Samara; and five registration certificates for Mr.

Targgart and his wife Janet.  (*Id.* at 441-42.)  In addition, the glove box contained a piece of paper

with names and phone numbers of Lee Targgart, Larry Targgart and Janet Targgart, together with

a sum of $10,000.  (*Id.* at 443.)

Officer Phillip Nardone testified that he also was part of the crime scene investigation unit. On January 15, 2008 at about 8:00 p.m., he was dispatched from an assignment at the high school to 1506 Glenrose on a report of kidnapping and torture. (*Id.* at 447-48.) He arrived at the scene at about 8:25 p.m., where he found Sergeant Dionese and Officer Zehr. Officer Jessica Showers came later and helped in the search. (*Id.* at 448.) He was told by Sergeant Dionese and Office Zehr that a woman had been held captive in the west bedroom, where men had dowsed her with water, tortured her, and attempted to electrocute her with the heater. (*Id.* at 449.) When he first arrived, they had no warrant, so he took pictures of the outside of the house. After getting the warrant and based on the information and wishes of Dionese and Zehr, he concentrated on the west upstairs bedroom. (*Id.* at 452.) He took photographs of that room, including the heater, clothing, duct tape, and a chair. (*Id.* at 453. The living room contained a bed, on which he found a hammer, a knife, a phone and a drawer. (*Id.*) Nardone identified photographs of the evidence he found in the bedroom: socks with duct tape on them; white cloth that looked like it had been torn; a blue bra that had been cut in the front; a tennis shoe with duct tape on the shoelace; another piece of duct tape; a chair and desk; a refrigerator containing alcohol bottles; a broken broom handle; a pair of blue pliers; two razor blades and other metallic household junk. (*Id.* at 458-76.) Nardone testified that a BB gun was found by Officer Jessica Showers in the piles of clothes in the east bedroom. (*Id.* at 476, 493.) The BB gun was examined for fingerprints. (*Id.* at 477.) In addition, Nardone identified photographs taken of the 1987 Chevrolet Caprice, after it was towed to the police station. (*Id.* at 478-80.) He also found a white plastic gallon jug, a hammer or mallet, and a knife, but he did not collect them into evidence and they were not examined for prints. (*Id.* at 484-86.)

- 19 -

Dr. David Castle testified that he worked as an emergency physician at both campuses of Sparrow Health System.  (Tr. III at 515-16.)  On January 15, 2008, he worked the afternoon shift from 2:00 p.m. to 11:00 p.m., and he treated Raya Doyle.  (*Id.* at 518.)  Doyle initially was seen by a physician assistant, and Castle himself saw Doyle for the first time at 8:25 p.m.  (*Id.* at 519.)  She arrived with an ambulance and the police.  (*Id.* at 520.)  Doyle reported that she had been at home when her boyfriend entered with two friends.  She subsequently was assaulted, resulting in multiple injuries.  (*Id.* at 521.)  She underwent multiple x-rays, CT scans of her brain and her neck, laboratory testing, and an ultrasound of her abdomen and pelvis.  Doyle had swelling, bruising and ecchymosis, principally around her left check and some on her right cheek.  She had lacerations on her breast tissue.  (*Id.* at 522.)  The result of the CT scan of her head and neck was normal.  (*Id.* at 523.)  She had bruising in a number of areas, including around her left eye and nasal bridge.  (*Id.* at 524.)  Her injuries were consistent with blunt force trauma, burns and lacerations.  (*Id.* at 526-27.)  Her shin areas were bruised from blunt force.  (*Id.* at 527.)  Some of the injuries to her leg were particularly well defined, indicating that they were caused with an instrument, probably cylindrical, rather than a fist.  (*Id.* at 529-30.)  Doyle had seven lacerations on the breast tissue, two of which caused the wounds to gape.  (*Id.* at 531-32.)  He recommended closing the lacerations with sutures, but Doyle did not wish to have sutures done.  They ultimately closed the wounds with steri strips.  (*Id.* at 536.)  The wounds would have led to scarring.  (*Id.* at 537.)  Doyle reported having been struck in the abdomen, and she had diffuse abdominal pain.  (*Id.* at 531, 535.)  Medical staff were concerned both because of possible injury to the internal organs and because the injury could cause Doyle, who was pregnant, to lose her fetus.  A possible need for a CT scan was discussed with Doyle, and medical personnel performed an ultrasound.  Ultimately, doctors determined not to perform an abdominal

- 20 -

CT scan, because the ultrasound showed a seven-week fetus, which is particularly susceptible to radiation. (*Id.* at 535.) Doyle also had burns on her right hip through the first layer of skin, which looked like cigarette burns. (*Id.* at 538-40.) The burns would cause scars. (*Id.* at 540.) Doyle also had bruising on her left hand and wrist, consistent with some kind of binding. (*Id.* at 547-49.) Dr. Castle testified that the injuries he observed were consistent with the history Doyle provided. (*Id.* at 564.) Doyle was provided symptomatic treatment with ice and pain control. (*Id.* at 525.)

Lansing Police Detective James Gill was called at approximately 9:00 p.m. on January 15, 2008, when he was at home. (*Id.* at 558.) He promptly went in to the police department. After being briefed by other officers, he interviewed Petitioner. (*Id.* at 559.) Petitioner was considered a witness at that point, because the police were still trying to find out what happened at the scene. (*Id.* at 560.) He recorded the interview with Petitioner. The video of the interview was played for the jury, but the court reporter did not transcribe the content. (*Id.* at 561.) Several aspects of Petitioner's interview were suspicious, including that he cried and stopped excessively and he did not escape when he had a chance to escape. (*Id.* at 567.) Gill suspected that Petitioner was not being fully honest. (*Id.* at 568.) After the interview, Petitioner was allowed to leave; he was not arrested. (*Id.* at 570.) Gill and Detective Kranich went to the hospital, where they interviewed Doyle. Petitioner was in the hospital waiting room. (*Id.* at 571.) With the additional information they obtained from the victim, the detectives called some officers over to arrest Petitioner, and he was transported to the jail. Gill and Kranich interviewed Petitioner again the following day, for which an audio recording was made. (*Id.*) They obtained no new information, as Petitioner became very emotional. (*Id.* at 572.)

Detective Kim Kranich testified that, on the night of the events in question, he received a call about the Glenrose Street incident from Sergeant Dionese, while he was working at another assignment.  (*Id.* at 583.)  Kranich arrived at the police station at about 9:30 p.m.  (*Id.* at 586.)  When he arrived, he understood that there was a victim at the Glenrose Avenue apartment who had been severely assaulted.  He learned that police had two men at the station, one of whom was being interviewed by Detective Gill, and the other of whom was Marquis Hightower.  Police also learned the nickname "Mouse," whom they knew to be Octavio Santiago.  (*Id.* at 587.)  Santiago was listed at his brother's address at 1014 Shiawassee.  (*Id.* at 587-88.)  Many officers were involved investigating the incident, including officers assisting answering the call, officers writing reports, officers at the scene, officers going door to door in the area, and Officer Zehr working to get a search warrant.  (*Id.* at 588-90.)  Detective Gill had already begun Petitioner's interview before Kranich arrived.  When Gill was finished, he brought Kranich up to speed.  Gill and Kranich then interviewed Marquis Hightower together.  (*Id.* at 591.)  Hightower gave them Santiago's name, and, based on police records, the officers put together a photographic lineup.  (*Id.* at 593.)  After the interview, they briefly went to the scene to talk with the crime scene investigator, before going to the hospital.  (*Id.* at 592.)  At the hospital, they spoke with Doyle and gave her the photographic lineup, and she identified Octavio Santiago.  (*Id.* at 594.)  Officers were sent to pick up Santiago at his address, 1014 West Shiawassee, the same address at which Targgart had dropped his money.  (*Id.* at 595.)  Kranich formally talked to Doyle twice, once at the hospital and once during a taped interview.  He also spoke with Doyle about the case on many subsequent occasions.  (*Id.* at 584.)  Kranich concluded that Doyle cared deeply about Lee Targgart and would do nothing to hurt him.  (*Id.* at 585-86.)

During his interviews with Doyle, Kranich learned that one of her concerns was whether Petitioner was involved. (*Id.* at 596-97.) Because of the possibility of a domestic situation, Kranich made arrangements through the hospital and police dispatch to transport Doyle to Eve's House, a domestic violence shelter for women. (*Id.* at 597.) After making those arrangements, he returned to the station, because Santiago had been picked up at 1014 West Shiawassee, where he was found loading pillows and blankets into a car. (*Id.* at 598.) At the station, Gill and Kranich first re-interviewed Hightower. Petitioner, however, had been released, because his involvement initially was uncertain, given that he was the person to make the call to police and because he provided some information to police. (*Id.* at 598-600.) But after Kranich's initial interview of Hightower and his re-interview of Doyle, the detectives had suspicions of Petitioner. (*Id.* at 600.) Then, after interviewing Santiago, the officers concluded that they needed to speak with Petitioner again. (*Id.* at 600.) They learned that Petitioner was in the waiting room at the hospital. (*Id.* at 600-01.) Detectives Gill and Kranich returned to the hospital and placed Petitioner under arrest. (*Id.* at 601.) Kranich confirmed that arrangements had been made to transport Doyle to the shelter. (*Id.* at 602.) Three days later, Kranich took Doyle to Edward's Studio for additional photographs. (*Id.* at 603.) In the interim, on the morning after the assault, Kranich ensured that all reports were complete and then met with the prosecutor concerning charges. (*Id.* at 603.) They determined that additional investigation was necessary, and Kranich arranged to meet again with Doyle that evening. (*Id.* at 604, 609.) He also went to where crime scene analysts were processing the Caprice, to help them go through the vehicle. (*Id.* at 604.) He pulled the items that were in the glove box and threw them on the front seat. He noticed Lee Targgart's driver's license. (*Id.* at 605.) He also found a handwritten note that looked like a bunch of names for Lee Targgart, including names, addresses and

phone numbers. (*Id.* at 605-06.) He believed that the information on the paper was being used to locate Mr. Targgart. (*Id.* at 608.) That day, he also attempted to locate Targgart, leaving messages in a variety of places. (*Id.* at 609.) When he and Gill arrived at the station on January 17, 2008, they had a message that Hightower wished to speak with them again. (*Id.* at 610.) After interviewing Hightower, Kranich contacted the prosecutor's office again, indicating that he needed to amend the search warrant that had been issued the night before, so that he could go back to the 1506 Glenrose address. (*Id.* at 610-11.) Once he received the search warrant, he asked Officer Nardone to look for a razor blade in the upstairs bedroom, as well as a pair of silver pliers with blue handles. (*Id.* at 611.) At that point, he had no information that a rubber mallet was used in the incident. He did not ask officers to pick up the gallon jug, as Petitioner already had admitted that he carried the jug upstairs. (*Id.* at 612.) The items were found on the bed in the living room. (*Id.* at 612-13.) Kranich was contacted a couple of days later by the landlord, Mr. Dyer, who had found a nine-millimeter handgun in the basement when he was cleaning the house out. (*Id.* at 613.) He made sure that officers went out to collect and preserve it. (*Id.* at 613-14.) Kranich testified that, in his first interview, Petitioner reported that Hightower and Santiago were adamant about not touching anything, because they were concerned about DNA, saying that he was "their fucking grab everything bitch." (*Id.* at 615.) Petitioner told Kranich that he had picked up a lighter and lit their cigarettes. (*Id.*) The majority of the items tested for fingerprints were taken from the upstairs bedroom where the assault occurred. (*Id.* at 617.) The chair found in that bedroom was carried upstairs by Petitioner. (*Id.* at 517-18.) Approximately 30 items were collected by the crime scene officers the first night. (*Id.* at 619.) In deciding which items to test for fingerprints or DNA, he considered work load, the feasibility of obtaining evidence from the object, and the crime lab limitations. (*Id.* at 619-20.) He ultimately

submitted four items to the Michigan State Police (MSP) crime lab:  the handgun, the BB gun, the razor blade, and the pliers.  (*Id.* at 620, 627.)  The MSP crime lab ultimately reported that only one item contained identifiable fingerprints:  the black BB handgun.  (*Id.* at 627-28.)  The cell phone found in the Caprice, which police believe belonged to Hightower, was taken into the department's CSI lab.  (*Id.* at 623.)  Kranich obtained a search warrant.  The cell phone record included a photograph of the handgun found at 1506 Glenrose.  (*Id.* at 624.)  The MSP crime lab subsequently indicated that DNA evidence was on some of the items, and they requested DNA samples from relevant parties for comparison.  (*Id.* at 629-30.)  Kranich drove to Saginaw, where he obtained DNA buccal swabs from the suspects, and he returned the samples to the crime lab.  (*Id.* at 629-30.)  On the night of January 17, 2008, Targgart called Kranich.  Kranich met with Targgart and his wife that evening.  (*Id.* at 633.)  Kranich acknowledged on cross-examination that Petitioner gave the nicknames of Hightower and Santiago at the time he made his call to police.  (*Id.* at 636.)  He gave his own name honestly, and he was cooperative at all times.  (*Id.* at 638-41.)  Kranich also acknowledged that the brown Caprice belonged to Hightower, not Petitioner.  (*Id.* at 644.)  Moreover, the handwriting on the documents found in the glove box did not appear to match Petitioner's.  (*Id.* at 647.)  Finally, the black BB handgun contained only Hightower's prints, and Hightower admitted that both the BB gun and the phone belonged to him.  (*Id.* at 614-15.)

Shannon Aho was a forensic scientist at the MSP crime lab.  She testified that at that time she was responsible for serology analysis.  (*Id.* at 620.)  Aho received four pieces of evidence from Detective Kranich.  She was told the name of the victim, Raya Doyle, and the names of the three suspects, Petitioner, Octavio Santiago and Marquis Hightower.  Working with clean surfaces and gloves, she separately examined a nine millimeter gun, a razor blade, a pair of pliers, and a

Marksman Repeater BB gun.  (*Id.* at 622-23.)  Aho first viewed the evidence under a bright light source to look for traces of blood or other cellular material.  (*Id.* at 624.)  Finding no blood on the Marksman Repeater, she swabbed the grips, trigger and slide of the gun for cellular material.  (*Id.* at 627.)  The nine millimeter gun had a suspicious stain, but it tested negative for blood.  She then swabbed the nine millimeter on each grip, the trigger area, and the hammer.  (*Id.* at 632.)  Aho visually examined the razor blade for blood and then separately swabbed the grip of the blade and the cutting edge.  (*Id.* at 633-34.)  She viewed the pliers both under a bright light source and a stereoscope.  She found an area on the handle that could have been blood, but it tested negative.  She then swabbed both handles before separately swabbing the teeth.  (*Id.* at 636-37.)

Michigan State Police Criminalist Amber Smith also worked as a serologist who examined the buccal swabs provided by Kranich.  (*Id.* at 645.)  According to protocol, she worked with clean instruments and surfaces each time she opened the packages containing the buccal swabs from Doyle, Santiago, Hightower and Petitioner.  She took a cutting from each swab, placed it in a tube, and then put it in the freezer for the DNA analyst.  (*Id.* at 646-50.)

Dr. Julie Howenstine testified as a DNA analysis expert from the MSP crime lab.  (*Id.* at 657.)  She received cuttings from swabs taken from two weapons (an Interarms nine millimeter handgun and a Marksman Repeater gun), a razor blade (with separate samples from the grip area and the blade), and a pair of pliers (with separate samples from the grip and the teeth).  (*Id.* at 661.)  Howenstine removed the samples from the freezer in the biology processing lab, and each was labeled and tracked through the laboratory under a common case number with a specific sample suffix.  (*Id.* at 661-62.)  She compared the samples, looking to include or exclude known DNA sources.  (*Id.* at 665.)  Howenstine testified that DNA is analyzed in multiple steps, by breaking

down the cells, releasing the DNA, cleaning the DNA of impurities, quantitating the concentration, replicating the pieces of DNA, and analyzing the results for comparisons.  (*Id.* at 665-66.)  Four results are possible:  (1) a full match of all 13 tested locations on the 23 chromosome pairs; (2) a partial match of three or four locations; (3) inconclusive results where the DNA types do not exceed a reportable threshold; and (4) exclusion by finding at least one or two points that do not match.  If a mixture of DNA is present, the information may be sufficient to say that the person is not excluded as a possible source.  (*Id.* at 667-69.)  The Interarms nine millimeter contained a mixture of DNA, from which Hightower, Doyle and Petitioner could be excluded, but not Santiago.  (*Id.* at 673.)  The sample from the pellet gun was an even more complex mixture, but the major donor matched Petitioner's DNA.  (*Id.* at 674.)  Hightower and Doyle could not be excluded as contributors, and Santiago was inconclusive.  (*Id.* at 675.)  The razor grip yielded DNA from more than one donor. The DNA was incomplete, but Howenstine was able to exclude Santiago, Hightower and Doyle, and the sample was inconclusive as to Petitioner.  (*Id.* at 676.)  The razor blade contained multiple donors, was inconclusive as to Doyle, excluded Santiago and Hightower, and did not exclude Petitioner.  (*Id.* at 678-79.)  The sample from the plier handle, while partial, matched Petitioner and excluded the others.  The plier teeth matched Petitioner and excluded all three other samples.  (*Id.* at 680.)  From these findings, Howenstine concluded that neither Santiago nor Hightower had significant contact with the razor blade or grip, the plier handles, or the plier teeth.  (*Id.* at 682-83.) Howenstine acknowledged that DNA can be transferred to items located in a person's home and that the presence of absence of cells could have a number of explanations.  (*Id.* at 679-83.)

At the close of the prosecution's proofs, defense counsel moved for a directed verdict. (*Id.* at 704-07.)  The court denied the motion.  (*Id.* at 712.)  Petitioner testified on his own behalf.

He stated that he met Raya Doyle in May 2007, while he was an inmate worker at the jail. (*Id.* at 715-16.) He acknowledged that he had a lengthy criminal history, including 2005 convictions for third-degree home invasion, embezzlement, false reporting of a felony, and unlawful driving away of an automobile. He also pleaded guilty in 2004 to stealing or retaining without consent a financial transaction device. (*Id.*) Doyle introduced Petitioner to Targgart in late September or early October of 2007. (*Id.* at 716-17.) He was friendly with Targgart, and the three went out to lunch together and went shopping together. (*Id.* at 717.) The first time he met Targgart, Petitioner was employed, doing construction work, though his position lasted only a week. Petitioner acknowledged that neither he nor Doyle had a job, and they lived off the generosity of Targgart. (*Id.*) Targgart would come by a couple of times each week, and either Doyle and Targgart or all three would go to lunch together. Targgart would then give Doyle money. (*Id.* at 717-18.) During the period Petitioner knew Targgart, Targgart's relationship with Doyle was no longer sexual; they were just good friends. (*Id.* at 718.) Doyle was honest about her relationship with Targgart from the beginning, and, while Petitioner was at first uncomfortable about being supported by Targgart and having his girlfriend have such a close male friend, he accepted the relationship. (*Id.* at 719.) Petitioner learned that Doyle was pregnant on December 28, 2007, and he was very happy about it. (*Id.*)

Petitioner testified that he met Octavio Santiago in the summer of 2006 at a party on Shiawassee Street. He did not meet Marquis Hightower until October of 2007. (*Id.* at 720.) Petitioner bought his marijuana from Santiago, typically first receiving a dime bag ($10.00 worth) of marijuana from Santiago and then paying later, when he had the money. (*Id.* at 720-21.) Sometimes the money would add up, as Petitioner smoked substantially more than a dime bag each week. (*Id.* at 721.) Contrary to Doyle's testimony, Petitioner testified that Santiago had come over

dozens of time to smoke marijuana with Petitioner, and Doyle had met Santiago.  Doyle did not like

it when Petitioner brought people over, because she was a private person, and she would get mad at

Petitioner.  (*Id.* at 722.)  Petitioner nevertheless kept bringing people, such as Santiago, his brothers,

or neighbors, because he liked to smoke marijuana and he wanted to do it in his home.  (*Id.* at 723.)

Doyle would occasionally sit on the porch with them, but she did not smoke with him.  (*Id.*)  Doyle

typically was either drunk or high on cocaine when he brought people over.  (*Id.* at 724.)  If Doyle

got mad when she was inebriated, she would yell until either Petitioner or the others left.  (*Id.* at

724.)  She sometimes would say regrettable things to him in that condition, and she sometimes talked

about her relationship with Targgart in front of others.  (*Id.* at 725-26.)

On January 15, 2008, Petitioner woke up around noon, though Doyle was still

sleeping.  At approximately 3:30 p.m., he left the house to walk four blocks to the store to buy some

cigarettes.  When he was nearly there, he met Santiago and Hightower, who were walking toward

him on the opposite side of the street.  (*Id.* at 728-29.)  Petitioner walked up to Santiago and asked

him if he had any marijuana.  Santiago said that he did, and the three walked back to Petitioner's

house to smoke it.  (*Id.* at 730.)  Petitioner led the others into the living room and then sat down on

the bed next to Doyle and began breaking up the marijuana to remove the seeds and stems.  Doyle

was watching Dr. Phil on television, and she was sipping whiskey.  (*Id.* at 732-33.)  Santiago and

Hightower were also in the living room.  Hightower was to Petitioner's left, and Santiago was to the

right of Doyle, almost in the dining room.  (*Id.* at 734.)  Petitioner rolled the entire bag of marijuana

into a blunt and the three men began smoking it.  (*Id.* at 734, 737-38.)  Doyle continued to drink her

whiskey from the bottle.  (*Id.* at 734.)  As he smoked, Hightower was about an arm's reach behind

and to the left of Petitioner and Santiago was in a chair to the right of Doyle.  (*Id.* at 735-36.)  Shortly

after they finished the marijuana, Petitioner saw Santiago cock a gun and point it at Raya and say,

"[l]ay down, bitch." (*Id.* at 738.) After looking at Santiago, Petitioner looked back at Hightower,

who had a gun pointed at Petitioner's head. (*Id.*) Hightower told Petitioner to tie Doyle up or he

would murder Petitioner. (*Id.* at 739.) Hightower held the gun in his left hand and took tape from

his pocket with his right hand and threw it to Petitioner. (*Id.*) Petitioner felt scared, and he believed

that they were serious. He told Doyle that they were not joking, and he put his hand on her shoulder

and told her to lie down. (*Id.* at 741-42.) Petitioner taped Doyle's hands behind her back and taped

her feet together at the ankles. (*Id.* at 742,) Doyle was on her stomach, though she could move her

head. Hightower and Santiago told Petitioner to carry Doyle upstairs. (*Id.*) He draped her over his

shoulder, and he carried her upstairs. (*Id.* at 743.) Petitioner believed that if he did not do what the

men said to do, he would be killed. (*Id.* at 744.) Petitioner took Doyle into the bedroom with all the

clothes in it, and he laid her down on a pile of clothes. Santiago then told Petitioner to leave the

room and go with him into the other room. Hightower remained in the room with Doyle, and

Santiago went into the other room with Petitioner, ordered him to sit in a chair, and held a gun on

him. (*Id.* at 745.) After that, Petitioner could not see Hightower or Doyle, but he could hear Doyle

being hit and could hear Hightower yelling at her. (*Id.* at 746, 749.) Some minutes later, Hightower

came into the room and ordered Petitioner to go downstairs and get another chair, some water, and

other items, and Hightower and Santiago followed him downstairs. Petitioner filled a milk jug with

water and brought a chair. (*Id.* at 747-48.) Following instructions, Petitioner put both the chair and

the water jug in the room he had been occupying. (*Id.* at 748-49.) At all times, Santiago had a gun

pointed at him. (*Id.* at 749.) Hightower went back in the room with Doyle. (*Id.*) Petitioner heard

Hightower demanding Targgart's phone number from Doyle. Neither Petitioner nor Doyle ever had

Targgart's phone number.  (*Id.* at 750.)  After Hightower had beaten Doyle for awhile, he came into the room occupied by Petitioner and told Petitioner to go pick Doyle up.  Petitioner carried Doyle into the room he occupied and, as instructed, set her into the chair he had brought upstairs.  (*Id.* at 751-53.)  Both Hightower and Santiago still had guns.  (*Id.* at 751-52.)  Hightower told Petitioner to tape Doyle to the chair.  (*Id.* at 753.)  Petitioner had to remove the tape from her hands so that he could tape her to the chair.  (*Id.*)  He cut the tape from her hands with a big knife he also had brought upstairs.  (*Id.* at 754.)  Doyle had lost consciousness when Petitioner taped her arms to the arms of the chair.  (*Id.* at 754-55.)  Hightower told Petitioner to "hurry up and cut that tape off, mother fucker."  (*Id.* at 756.)  Hightower also told Petitioner to blindfold Doyle, and Petitioner used a sweater to do so.  (*Id.* at 763.)  Petitioner believed the men were going to kill both Doyle and him.  (*Id.* at 755-56.)  After Doyle was taped to the chair, Hightower took the jug and threw water on Doyle, to wake her up.  (*Id.*)  Hightower then told Petitioner to go back downstairs.  (*Id.* at 757.)  Petitioner walked out of the room with both Hightower and Santiago behind him.  They followed him downstairs and told him to bring the radio and a heater upstairs, and Hightower grabbed a broom.  (*Id.* at 758.)  Petitioner put the radio and heater in the room where Doyle had been taped to the chair.  Hightower then beat Doyle with the broomstick.  (*Id.* at 759.)  During this time, Petitioner was on the floor on his knees, as Santiago had instructed him.  Santiago continued to hold a gun in his right hand.  (*Id.* at 760.)  Hightower hit Doyle in the neck and in the shins with the broomstick.  (*Id.*)  He kept asking Doyle for Targgart's phone number.  (*Id.* at 761.)  The second beating lasted for 30 to 45 minutes.  (*Id.* at 762.)

Before he began to beat Doyle with the broomstick, Hightower demanded that Doyle give him her landlord's phone number, which she did.  (*Id.* at 763)  Hightower told Petitioner to go

downstairs. He and Santiago followed, and they had Doyle's phone. (*Id.*) Hightower instructed Petitioner to sit in the chair and told him to get Targgart's phone number from the landlord. (*Id.* at 764.) After Hightower dialed the number, Petitioner spoke to Dyer, telling him that it was an emergency and that he needed Targgart's phone number. (*Id.* at 765.) Because he could not give the real reason, Petitioner indicated that there was a problem with the baby. (*Id.*) Dyer responded that he did not know Targgart's phone number or where he lived. (*Id.*) After the call, Hightower instructed Petitioner to grab the toolbox that was in the front doorway. (*Id.* at 766.) After he brought the box upstairs, Santiago told Petitioner to go to his corner. (*Id.* at 767-68.) Santiago dumped the toolbox on the floor, and both Santiago and Hightower rifled through the contents. (*Id.* at 768.) Hightower handed Petitioner a stapler and told him to staple Doyle, but Petitioner refused, explaining, falsely, that the stapler was not operable. (*Id.* at 769.) Hightower told Petitioner to cut Doyle's shirt off, and Petitioner grabbed the knife, pulled her shirt out, and cut it off. (*Id.*) Petitioner went back to his corner, and Hightower renewed his beating of Doyle. (*Id.* at 770.) Santiago told Petitioner, "[C]ut the bitch." Petitioner just stayed in the corner and did not say anything. He believed that Santiago and Hightower were going to kill him for disobeying. (*Id.* at 771-72.) Petitioner testified that, on several occasions, Hightower jammed his gun up to Petitioner's head. (*Id.* at 766, 822.) Then Santiago got up and cut Doyle, though Petitioner could not see what instrument he used, because Santiago was standing between Petitioner and Doyle. (*Id.* at 772.) Petitioner could see Santiago move his arm, and when Santiago stepped away, Petitioner could see Doyle's chest. (*Id.* at 772-73.) Santiago then pinched Doyle's nipples with a pair of silver pliers. (*Id.* at 773-74.) Petitioner did not say anything because he did not want to get them killed. (*Id.* at 774.) Hightower grabbed Doyle's whiskey bottle, he poured whiskey on Doyle's chest. (*Id.* at 775.)

- 32 -

Hightower then told Petitioner that they were going to the store to buy Hightower some cigarettes and something to drink. (*Id.* at 776.) Petitioner left the room, followed by Hightower and Santiago. (*Id.* at 777.) After Hightower put his coat on, he told Petitioner that they were leaving, that Petitioner was going to get Hightower cigarettes, and that if Petitioner tried anything, Hightower would call and instruct Santiago to kill Doyle. (*Id.* at 778.) The two assailants had no money, and Santiago knew that Petitioner could get credit at the store and at the gas station. (*Id.*) Hightower opened the front door and told Petitioner that they were walking to his car, which was down LaMont Street, about five or six houses from Petitioner's front door. Hightower walked behind Petitioner, and Petitioner believed that Hightower continued to have his gun in his waistband. (*Id.* at 780.) When they reached the car, Petitioner sat in the front passenger seat while Hightower drove. (*Id.* at 781.) Petitioner feared doing anything for fear that Doyle would be killed. (*Id.* at 780.) When they got to the store, Hightower told Petitioner to go in and get him cigarettes and something to drink. (*Id.*) When he got inside the store, Petitioner told the owner what was happening and told him that he needed to use the phone to call 911, but the owner refused. (*Id.* at 782.) However, a man in the store gave Petitioner his phone. Petitioner told 911 that there was an emergency at his house and that they needed to get there. (*Id.* at 784.) Petitioner described the vehicle, explained that "Keese" and "Mouse" were involved, and identified himself. (*Id.*) After Petitioner called 911, Petitioner tried to get the cigarettes, but the man at the store would not cooperate, telling Petitioner to go across the street to get them. (*Id.* at 782.) Petitioner walked across the street to the gas station and told the owner what was happening and that he needed cigarettes. The owner gave him the cigarettes. The station did not have alcohol, so Petitioner could not get the liquor. (*Id.* at 783.) On the way home, Hightower saw a police officer walking up Glenrose Street with a rifle, so he called Santiago and

told him that the police were there.  (*Id.* at 784-85.)  The police pulled them over on Comfort Street.

(*Id.* at 785.)  Petitioner got out of the car and put his hands behind his head, as instructed.  Petitioner

explained to Officer Lam that Hightower was the guy who was beating his girlfriend and holding

them hostage.  Lam put Petitioner in the back of the cruiser, and then Sergeant Dionese came over

to talk to Petitioner.  Petitioner began crying.  He told the police that they needed to get into the

house and take care of Doyle, because she was hurt.  (*Id.* at 787.)  Officer Lam then uncuffed

Petitioner, but told him to stay in the back of the car.  They drove over to the corner of Redwood and

Robertson.  Lam told Petitioner that someone had run out of the house and "he had to do a point or

something like that."  (*Id.* at 788.)  After awhile, Lam drove Petitioner to the north precinct.  (*Id.*)

The police put him in an interrogation room, and Petitioner voluntarily talked with Detective Gill,

but Petitioner did not sign anything.  (*Id.* at 789.)  When Gill finished speaking with him, Detective

Kranich came in.  Because his cell phone was gone, Petitioner provided the detectives with his

brother's phone number and address, as well as the phone numbers for his father and his step-

mother.  (*Id.* at 790.)  After the police let him go, he went to the hospital.  (*Id.* at 789.)  He went to

the emergency room and then to the intake admissions people.  They eventually told him that he

needed to speak with security.  After doing so, he was told that she was in radiology.  He was not

allowed into the area, but he could see Doyle on a gurney.  (*Id.* at 791.)  When Doyle came out of

radiology, she was asleep.  He waited in the emergency waiting room where, after a couple of hours,

Detectives Gill and Kranich came in.  (*Id.* at 792.)  They arrested him, and he signed a waiver of

rights form.  They then conducted a second interview.  (*Id.* at 793.)  Petitioner was shown pictures

of Doyle's cuts, but he did not learn her full condition or that the baby was alright until significantly

later.  (*Id.* at 794-95.)  Petitioner described his demeanor during the incident as calm, because he

believed that being a hot-head would have gotten them both killed. (*Id.* at 795.) According to Petitioner, he has had written correspondence with Doyle, though they have never discussed the case. He has not been able to talk with her. (*Id.* at 796-97.)

On cross-examination, Petitioner acknowledged that he got the money to pay for his marijuana from Doyle, who got the money from Targgart. (*Id.* at 801.) He also acknowledged that during all of the time he lived with Doyle, between September 2007 and January 2008, he had worked only one week. (*Id.* at 800.) Petitioner admitted that, at the time Targgart's vehicle was robbed in October 2007, Petitioner was living in the house, but he had left the house that morning before Targgart arrived and returned home an hour after Targgart left. (*Id.* at 800-01.) He also acknowledged that he was upset when he learned that Targgart would no longer support them, though he had told Detectives Kranich and Gill that he was not upset. (*Id.* at 802-03.) Petitioner admitted that he suffered no injuries that day. (*Id.* at 805.) He also acknowledged that he was never bound, confined, gagged or blindfolded. (*Id.* at 820.) In fact, he admitted that, when he heard Hightower say that "he would burn every inch of her pussy," Petitioner went into the room and told Hightower, "No." (*Id.* at 820-21.) Further, he admitted that, in his 911 call, he did not mention that anyone was injured; he said instead that there were people at his home with guns and knives. (*Id.* at 809.) After calling, he went across the street to get cigarettes, and he himself smoked a cigarette as he moved from place to place. (*Id.* at 809.) In addition, Petitioner acknowledged that he was under a no-contact order with Doyle, which he violated by sending her letters. (*Id.* at 813.) He also did not ask any questions or express any surprise when Santiago and Hightower pulled out their guns, though the conduct was wholly unexpected and Doyle thought it was a joke. (*Id.* at 814.) He

further stated that he had not told the police in either of his statements that he had been forced to be on his knees or that Hightower had put a gun to his head.  (*Id.* at 822.)

At the conclusion of trial, on May 20, 2009, the jury found Petitioner guilty of torture and unlawful imprisonment.  (Tr. VI at 5.)  On June 24, 2009, Petitioner was sentenced as a fourth felony offender to serve a term of 20 to 70 years on the torture conviction and 10 to 50 years on the unlawful-imprisonment conviction.  (Sentencing Transcript, (S. Tr.) at 13, docket #25.)

Petitioner filed a motion for new trial or for resentencing on November 6, 2009.  (Mot. for New Tr., docket #29.)  A hearing was held on June 4, 2009.  (Hr'g on Mot. for New Tr., docket #26.)  The trial court denied both motions on the record at the hearing, and issued an order to that effect on December 21, 2009.  (12/31/09 Cir. Ct. Order, docket #29.)

### B.      Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on December 9, 2009, raised the same four issues as presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #26.)  Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on September 21, 2010.  (*See* 9/21/10 Mich. Ct. App. Ord, docket #27.)  By unpublished opinion issued on March 8, 2011, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 3/8/11 Mich. Ct. App. Opinion (MCOA Op.), docket #28.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same four claims raised before and rejected by the Michigan Court of Appeals.  Petitioner was granted leave to amend his application, in which he further developed his first issue.  By order entered December 30, 1997, the Michigan Supreme Court denied his application

- 36 -

for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #27.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court

announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I. Sufficiency of the Evidence

Petitioner claims that the prosecutor presented insufficient evidence to support his convictions for torture and unlawful imprisonment of Raya Doyle. Specifically, he contends that he was acting under duress and that the prosecutor's evidence was insufficient to prove that he willingly participated in the offenses.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

As the Michigan Court of Appeals held in the instant case, "[a] person commits the felony of torture if he or she, 'with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within

his or her custody or physical control . . . .'"  *People v. Fox*, No. 293131, 2010 WL 3658607, at *1

(Mich. Ct. App.  Sept. 21, 2010) (citing MICH. COMP. LAWS § 750.85(1)).  Moreover, Petitioner was

charged as an aider and abettor.  Under Michigan law, a person may be found guilty as an aider and

abettor if the prosecution proves the following three elements:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.

*People v. Robinson*, 715 N.W.2d 44, 47-48 (Mich. 2006) (internal quotations omitted).

The evidence was both overwhelming and undisputed that Hightower and Santiago

intentionally inflicted cruel and extreme physical and mental pain on Doyle.  Moreover, both the

victim's testimony and Petitioner's own testimony unequivocally demonstrated that Petitioner

assisted Hightower and Santiago to torture Doyle.  Petitioner himself bound, gagged and blindfolded

Doyle.  Petitioner physically transported her to the rooms in which she was tortured.  He carried

upstairs the objects with which she was tortured:  the chair to which she was bound, the water jug

with which she was drenched, the knife used to cut the tape, and the tool chest containing the pliers

and razor.  Finally, by his own admissions, Petitioner clearly had knowledge that Hightower and

Santiago intended to harm Doyle and, at least after a very short period of time, was well aware of

their extreme cruelty.  As a consequence, the evidence overwhelmingly showed that Petitioner aided

and abetted in the torture of Doyle.

In order to prove unlawful imprisonment, the prosecution must show that the

defendant "knowingly restrain[ed] another person under one of the following circumstances:

(1) '[t]he person is restrained by means of a weapon or dangerous instrument,' (2) '[t]he restrained

person was secretly confined,' or (3) '[t]he person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.'" *Fox*, 2010 WL 3658607, at *3 (quoting MICH. COMP. LAWS § 750.349b(1)).  Again, Petitioner was charged as an aider and abettor.  The evidence was sufficient to prove the crime under any of the three theories. By Petitioner's own admission, Hightower and Santiago restrained Doyle through the threat of a gun. Respecting the second theory, Petitioner himself admitted to taking Doyle to an upstairs room and binding, gagging and blindfolding her, thereby keeping her imprisoned in secret from any person other than the assailants.  Third, overwhelming testimony by Petitioner and Doyle demonstrated that the intent in imprisoning Doyle was to facilitate the extortion of Targgart.  Under any theory, therefore, the prosecutor proved that Doyle was unlawfully imprisoned.  As with the torture, Petitioner himself admitted to taking actions to assist in the commission of the crime, and he was fully aware of Hightower's and Santiago's intent to imprison Doyle, as he himself transported Doyle and tied her up, gagged and blindfolded her.  Accordingly, both the evidence and Petitioner's own admissions demonstrated that he aided and abetted in the commission of the offense.

Petitioner strenuously argues, as he did at trial, that he did not willingly participate in either the torture or the unlawful imprisonment, because he was acting under duress when he aided and abetted the commission of the offenses.  He therefore contends that his convictions on the offenses are unsupported by the evidence, notwithstanding the previously discussed proof of the offense elements.

The Supreme Court has held that, in most circumstances, the defenses of necessity and duress are not elements of a substantive criminal offense because they typically do not negate the *mens rea* required for conviction. *Dixon v. United States*, 548 U.S. 1, 6 (2006).  Under Michigan

- 42 -

law, duress is not considered an element of a criminal charge, but is instead a common-law affirmative defense.[2]  *See Dando v. Yukins*, 461 F.3d 791, 803 (6th Cir. 2006) (citing *People v. Lemons*, 562 N.W.2d 447, 453 (Mich. 1997)).  The Sixth Circuit repeatedly has recognized that challenges to evidence on non-elements like duress and insanity do not generally implicate the due process concerns addressed by *Jackson* and *Winship*.  *See Gall v. Parker*, 231 F.3d 265, 286-87, 307-08 (6th Cir. 2000) (addressing Kentucky law of insanity), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir. 1999) (holding that *Jackson* "does not implicate affirmative defenses, because proof of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime"), *abrogated on other grounds by* 28 U.S.C. § 2261 *et seq.  See also Allen*, 858 F.2d at 1200.  Because a showing of duress would not negate proof of the requisite *mens rea* or any other essential element of the offenses of torture and unlawful imprisonment, Petitioner's claim that the prosecution failed to meet its burden to prove duress is not cognizable in this habeas proceeding because it fails to raise a federal constitutional issue.  *See Garris v. Curtin*, No. 1:05-cv-209, 2008 WL 680416, at *11 (W.D. Mich. Mar. 7, 2008); *cf. Gall*,

---

[2] To be entitled to an instruction on the defense of duress under Michigan law, the defendant bears the burden to produce some evidence from which the jury could conclude that each of the following elements are present:

(A)  The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

(B)  The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

(C)  The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

(D)  The defendant committed the act to avoid the threatened harm.

*People v. Lemons*, 562 N.W.2d 447, 453 (Mich. 1997) (quoting *People v. Luther*, 394 Mich. 619, 232 N.W.2d 184, 187 (1975)).

231 F.3d at 304 (holding that the affirmative defense of insanity is not cognizable on habeas review); *Duffy v. Foltz*, 804 F.2d 50, 54 (6th Cir. 1986) (same).

 In sum, because the prosecutor presented ample evidence of every element of both charged offenses, the state-court's determination that sufficient evidence supported Petitioner's convictions was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

 II. <u>Prosecutorial Misconduct</u>

 In his second ground for habeas relief, Petitioner argues that the prosecutor committed misconduct by "repeatedly accus[ing] [Petitioner] of crimes not contained in the indictment information." (Am. Pet., Page ID#56.) Although Petitioner does not develop his argument, the Court assumes that he meant to raise the substance of the issue asserted in his supplemental brief on appeal to the Michigan Court of Appeals and in his application for leave to appeal to the Michigan Supreme Court. There, Petitioner argued that the prosecutor repeatedly and improperly introduced a variety of evidence of other bad acts: evidence of Petitioner's poverty and unemployment; evidence that Petitioner would steal money from Doyle and would leave for weeks at a time; and evidence that Targgart was the victim of extortion, implying that Petitioner was involved in the extortion.[3] Petitioner also argues that the prosecutor improperly used evidence of a prior conviction

---

 [3]The court of appeals reviewed Petitioner's prosecutorial misconduct claims only for plain error because they were not the subject of contemporaneous objections. In addition, the court held that Petitioner had waived his claim that the prosecutor had repeatedly accused Petitioner of crimes not contained in the indictment, because Petitioner failed to develop his claim on appeal. The court therefore addressed the plain-error question only in a conclusory fashion. "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010). Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d

as substantive evidence of guilt.[4]  Petitioner contends that the introduction of the extensive evidence of other bad acts constituted prosecutorial misconduct that violated Petitioner's right to due process.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Although Petitioner frames his argument concerning the admission of other bad acts as one of prosecutorial misconduct, "it amounts in the end to a challenge to the trial court's decision

---

409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

[4]The court of appeals held that Petitioner failed to point the court to the improper use of impeachment evidence about which he complained.  Because Petitioner failed to develop his issue on appeal, the court gave only cursory review and found no plain error.  As with the prior issues, I will skip analysis of the possible procedural default and proceed to the merits.  *Hudson*, 351 F.3d at 215-16; *Binder*, 198 F.3d at 178.

to allow the introduction of this evidence." *Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009)

(citing *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001)).[5]  "'A prosecutor may rely in good

faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those

rulings . . . .'"  *Id.* (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)).  Moreover, as the

Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence

was properly admitted or improperly excluded under state law "is no part of the federal court's

habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine

state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas

review, a federal court is limited to deciding whether a conviction violated the Constitution, laws,

or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level

of due process violations unless they offend some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th

Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh

v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude

in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  Further, under the

AEDPA, the court may not grant relief merely because it would have decided the evidentiary

---

[5]The Michigan Court of Appeals rejected Petitioner's argument that the prosecutor committed misconduct by introducing testimony about Petitioner's poverty and unemployment on the grounds that the evidence was not improperly used as substantive evidence to prove Petitioner's guilt on the charged crimes or of his propensity to commit crimes, but only as evidence of motive.  The court of appeals held that, under Michigan law, the evidence of motive was properly admitted.  *Fox*, 2010 WL 3658607, at *5 (citing *People v. Flynn*, 287 N.W.2d 329, 333 (Mich. Ct. App. 1979) ("[e]vidence of motive which suggests the doing of the act, or the purpose for which it is done, is always admissible")).  Similarly, Petitioner's complaint that the prosecutor improperly introduced evidence that Petitioner stole money from Doyle and left for weeks at a time was admitted to challenge the credibility of Petitioner's purported devotion to Doyle, his concomitant assertion of duress, and his motive to continue the revenue stream.  Again, rather than being a question of prosecutorial misconduct, the question is one concerning the admissibility of evidence.  *Id.*  Likewise, Petitioner's contention that the prosecutor committed misconduct in introducing evidence of a scheme to extort money from Targgart is a question of whether the evidence should have been admitted to prove motive.

question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not and cannot meet this difficult standard.  There exists no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Because there was no constitutional violation in the admission of evidence (bad acts), the state court's decision was "far from" an unreasonable determination of the facts in light of the evidence presented.  *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.

In his final claim of prosecutorial misconduct, Petitioner contends that the prosecutor improperly referred in his closing argument to Petitioner's prior conviction for filing a false police report, not just to impeach Petitioner's credibility, but as substantive evidence that Petitioner's eventual call to the police was another false police report.  In context, the prosecutor argued as follows:

> So after Raya had been tortured and confined for three or more hours on January 15, the defendant and Marquis Hightower go to the store.  Lee has not come. There's no way to get ahold of Lee directly and they don't know what to do.  This beating at this point has gone on too long and too far for the defendant to comfortably believe that he can talk Raya out of this.  It's gone beyond his ability to control her without appearing to be in on the assault, without appearing to be protecting someone.  *So he falls back on an old trick [] and that is to file a false police report, which he was convicted of doing in Eaton County*[.]

(Tr. V at 864 (emphasis added).)  As soon as the prosecutor uttered the words, defense counsel objected, saying the conviction was improperly being used substantively, not merely for impeachment.  After briefly arguing that his intent was to challenge credibility, the prosecutor withdrew his response, recognizing that his argument was improper.  (*Id.* at 865, 869.)  When he continued his argument, he tried to correct it, advising the jury that they should only consider the conviction in assessing Petitioner's credibility, not in making them think he was a bad person or committed the offenses in issue.  (*Id.* at 865.)  At this juncture, defense counsel asked to approach, and the court excused the jury.  Defense counsel expressed concern that the prosecutor's attempt to correct the situation had merely highlighted the problem.  (*Id.* at 866-76.)  Defense counsel and the court agreed that the prosecutor's remark was unintentional.  (*Id.* at 868, 870.)  The jury was returned to the courtroom, and the court instructed that the jury should not consider any prior conviction of Petitioner for a purpose other than impeachment.  The court also advised that the jury would be given

- 48 -

further instructions about impeachment at the end of closings.  (*Id.* at 876-77.)  During final

instructions, the court addressed the limited purposes for which the jury could consider evidence of

other bad acts:

> You have heard evidence that was introduced to show that defendant
> committed crimes for which he is not on trial.  If you believe this evidence, you must
> be very careful only to consider it for certain purposes.  You may only think about
> whether this evidence tends to show that defendant had a reason to commit the crime,
> that the defendant specifically meant to torture or unlawfully — and/or unlawfully
> imprison Raya Doyle, that defendant acted purposefully, that is, not by accident or
> mistake, or because he misjudged the situation; that the defendant used a plan,
> system, or characteristic scheme that he has used before or since; who committed the
> crime that defendant is charged with.
>
> You must not consider this evidence for any other purpose.  For example, you
> must not decide that it shows that defendant is a bad person or that he's likely to
> commit crimes.  You must not convict defendant here because you think he is guilty
> of other bad conduct.  All the evidence must convince you beyond a reasonable doubt
> that defendant committed the alleged crimes or you must find him not guilty.

(*Id.* at 955-56.)

Petitioner cannot demonstrate that the prosecutor's brief comment rendered his trial

fundamentally unfair under the factors set forth in *Darden*, 477 U.S. at 182-83.  The comment was

isolated.  The prosecutor did not intentionally use the evidence improperly.  The prosecutor did not

manipulate or misstate the evidence, he merely used the evidence in a less than proper manner.  The

remark was immediately objected to by defense counsel.  A curative instruction was given, both at

the time of the incident and during final instructions.  In these circumstances, the Michigan courts

reasonably determined that the prosecutor's misconduct did not violated Petitioner's right to a fair

trial.

III.   <u>Ineffective Assistance of Trial Counsel</u>

In Petitioner's final ground for relief, he contends that trial counsel rendered ineffective assistance when he failed to object to the introduction of Petitioner's recorded statements to the police.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In

- 50 -

those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The court of appeals rejected the Petitioner's claim of ineffective assistance of trial counsel, as follows:

> Defendant also claims that trial counsel was ineffective for failing to object to the introduction of certain statements that he made to the police, including an audio-visual recording of his actual police interrogation. Defendant does not suggest that his statements to the police were made involuntarily, that they were given under coercive circumstances, that they were given in violation of his Sixth Amendment rights, or that he was not provided with a *Miranda*[3] [citation omitted] warning before making the statements. Instead, he merely argues that it was prejudicial for the prosecution to show the recording of his interrogation and to refer to his statements to the police, and that his trial attorney therefore should have objected. Defendant's statements to the police constituted admissions by a party opponent, and were properly admissible under MRE 801(d)(2). *See People v. Kowalak (On Remand)*, 215 Mich. App. 554, 556-557, 546 N.W.2d 681 (1996). Counsel is not ineffective for failing to raise a futile objection. *Ackerman*, 257 Mich. App. at 455, 669 N.W.2d 818. We perceive no ineffective assistance of counsel in this case.

*Fox*, 2010 WL 3658607, at *6.

The state court squarely held that Petitioner's statement was properly admitted under Michigan law. As previously discussed, it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68. The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir.

2013) (quoting *Bradshaw*, 546 U.S. at 76).   Because the evidence was properly admitted, any

objection by defense counsel would have been futile.   It is well established in this circuit that

"[c]ounsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance

of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d

492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v.*

*United States*, 204 F.3d 681, 683 (6th Cir. 2000).   As a consequence, the decision of the court of

appeals constituted a reasonable application of established Supreme Court precedent.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Dated:  July 30, 2015                                          /s/ Hugh W. Brenneman, Jr.
                                                                         HUGH W. BRENNEMAN, JR.
                                                                         United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections
may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th
Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).